UNITED STATES of America, Plaintiff,

v.

Harold McLEMORE, Jr., Defendant.

Crim. No. 7–80884.

United States District Court,
E. D. Michigan, S. D.

March 7, 1978.

1230

Loren G. Keenan, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Kenneth R. Sasse, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

PHILIP PRATT, District Judge.

Defendant Harold McLemore, Jr., is charged with escape from a federal penal facility in violation of 18 U.S.C. § 751 and with illegal possession of a firearm in violation of 18 U.S.C. § 1202(a)(1) (Appendix).[1] The case is presently before the Court on his motion to dismiss. The matters raised in the motion were the subject of an evidentiary hearing conducted on November 11, 1977.

The government does not, in any material fashion, dispute the defendant's version of the facts. From the pleadings filed to date and from the evidence adduced at the hearing, it appears that Mr. McLemore was convicted on December 30, 1969 of armed bank robbery. On July 6, 1970 he was sentenced to ten years in custody. In March, 1976 he was transferred from the Federal Correctional Institution at Terre Haute, Indiana to the Community Treatment Center in Detroit in anticipation of his imminent release on parole. It is from there that the Indictment charges that defendant walked away on April 7, 1976.

At the time of his alleged escape defendant was scheduled for parole on July 8, 1976.[2] On April 26, 1976 his parole was retarded and his case set for a rescission hearing, the date thereof being held in abeyance pending his apprehension and return to federal custody. Defendant's Exhibit 7.

On July 28, 1976, McLemore was seized in the City of Detroit by agents of the Federal Bureau of Investigation. The agents informed him, in substance and effect, that he was being arrested for escaping from lawful federal custody. He was turned over to the local police, who held him for several days in connection with a murder investigation. On August 1, he was transferred to the Detention Unit of the Federal Correctional Institution at Milan, Michigan, where he was held as a Marshal's prisoner.[3]

On May 2, 1977, nine months after his arrest and detention at Milan Federal Correctional Institution, defendant filed, *pro se*, a pleading styled "Motion for Dismissal of Indictment-Information-Complaint," in which he requested dismissal of charges arising out of the events and circumstances for which he had been arrested on July 28, on the ground that his statutory and constitutional rights to a speedy trial had been violated. Judge Fred Kaess of this Court denied the motion as premature, finding on the basis of his understanding of the facts presented to him at that time that defendant's speedy-trial rights had not yet attached.[4]

---

1. Defendant asserts in his brief that the government has informed defense counsel that Count Two of the Indictment, relating to the illegal possession of a firearm, will be voluntarily dismissed. The government has not disputed that assertion; consequently, the Court will assume that it is true.

2. Defendant, alleges, not without some hesitancy and evidence of confusion, that he was already on parole at the time he left Terre Haute FCI, a short period of residence at the CTC being prescribed as a special condition of that parole. The Court finds that the evidence preponderates toward the view expressed here. In any event the rationale supporting the disposition prescribed herein would be only fortified were it to come to light that defendant had indeed been paroled on the earlier occasion. See *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

3. "Marshal's prisoners" are segregated from the general prison population. Prisoners are generally committed to the custody of the United States Marshal for a limited and particular purpose, as, for instance, to await trial or to participate in a legal proceeding in some other capacity. Since no other "jail" facilities are available to the Marshal in this District, a section of the Milan FCI (the nearest available federal facility) has been utilized by him under an agreement with the Bureau of Prisons. What results is that in this District, Marshal's prisoners, although lodged at a federal correctional institution, are not in the custody of the Bureau of Prisons.

4. In finding defendant's motion premature, Judge Kaess relied in large measure on the representation of the government's counsel that defendant's incarceration at that time related to the 1970 sentence and not to the alleged 1976 escape.

Judge Kaess handed down his ruling on August 3, 1977. The instant Indictment was returned and filed on August 5, two days later. On August 12, 1977 defendant was returned to the general prison population of Terre Haute FCI. There he was brought before a panel of the United States Parole Commission on August 24.[5] On September 7, 1977 he was arraigned before a magistrate of this Court on the instant charges.

Except for sporadic interruptions of relatively short duration, when he was transferred to the custody of the Detroit Police Department,[6] defendant was in continuous confinement at the Detention Unit at Milan FCI from August 1, 1976 until August 12, 1977, when he was returned to Terre Haute. Defendant's Exhibit 9. No action was taken to rescind his July 8, 1976 parole until September 19, 1977, when the Commission announced its decision relative to the August 24, 1977 hearing. Defendant's Exhibit 6.

At this point it appears advisable to describe at greater length the type of incarceration to which defendant was subjected during this period from August, 1976 to August, 1977.

Lacking federally owned or contracted-for detention or jail facilities in the Detroit Metropolitan area, the United States Marshal has arranged with the Bureau of Prisons for the use of detention space at the Milan FCI. Marshal's prisoners are designated as such and, as such, they are either denied all access to various facilities, equipment, counseling services, and educational, recreational and other developmental programs, or they are afforded far more restricted opportunity to avail themselves of those facilities, services, and programs than are the members of the general prison population. In brief, incarceration at the Detention Unit should not be confused with the usual beneficial incidents of regular inmate status one associates with a federal correctional institution. Under the control of the Marshal, defendant was confined in a jail-type environment. It is in this context that the nature of defendant's confinement is to be understood.

To recapitulate, then, the Court observes that the defendant, having been taken into custody on July 28, 1976 for escape, remained a Marshal's prisoner at the Detention Unit at Milan FCI from August 1, 1976 until August 12, 1977, a period exceeding one year. He was not arraigned on any charge of escape. The parole authorities were not advised of his return to custody. No action of any kind was taken, in fact, until after he filed, *pro se,* a petition to dismiss an "Indictment-Information-Complaint" which had not yet even been filed against him, and indeed was not until after his petition had been denied. The sequence of events is too rapid for the Court not to infer that the return to Terre Haute two days after Judge Kaess' ruling was not coincidental and, thus, that it was that ruling that nudged the government out of its inaction, so that finally defendant was returned to Terre Haute, given a rescission hearing, and arraigned on a contemporaneously obtained indictment.

Now the defendant, represented by counsel, presents essentially the same claims that Judge Kaess rejected on the earlier occasion. More specifically, he contends that the treatment to which he has been subjected at the hands of the federal

---

**5.** Exhibit 7 is a United States Government Memorandum directed "to the File." It succinctly sets forth the dates and actions pertinent to this point. In the opinion of this Court it is significant to note from that Memorandum the following insofar as it displays the parole authorities' understanding of defendant's circumstances: the Parole Commission issued an order on April 26, 1976 requiring a rescission hearing " . . . upon [Mr. McLemore's] return to a Federal institution"; the Defendant was in custody at Milan FCI since August 16, 1976; the parole authorities, however, were not notified of Defendant's arrest and incarceration until August 16, *1977*.

**6.** The longest such interval lasted from January 18 to January 27, 1977, during which time defendant was held in the Wayne County Jail. The last one was of one day's duration and occurred on March 2, 1977. The Court has not been apprised of the purpose or nature of these sojourns.

government, as outlined above, constitutes a violation of his rights under both the Fifth and Sixth Amendments of the Constitution, under Rule 5 of the Federal Rules of Criminal Procedure, and under the Speedy Trial Act of 1974, 18 U.S.C. § 3161 *et seq.*, as implemented, *interim,* by Local Rule XXXI.

Under the foregoing circumstances, the Court is convinced that it must exercise its discretion to dismiss the Indictment. It does so in the exercise of its supervisory control over the integrity of its proceedings, an inherent power codified for federal courts in the provisions of Rule 48(b) of the Federal Rules of Criminal Procedure.[7] At the same time the Court acknowledges that these circumstances present the basis for a substantial and appealing argument that the defendant's Sixth Amendment right to a speedy trial has been violated and that, therefore, the same remedy may be required under that theory. Since the Court finds, however, more than adequate grounds to sustain its ruling in the provisions of Rule 48(b), it does not deem it necessary at this time to determine the constitutional issue. *See Clay v. Sun Ins. Office Ltd.,* 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960).

On the other hand, this is not to say that the Sixth Amendment implications can be ignored. On the contrary, analysis of precedents dealing with Sixth Amendment issues provides illumination which must be considered for an intelligent, correct, and prudent application of Rule 48(b).

In recent years the United States Supreme Court has devoted much attention to the elaboration of principles defining the government's duty to proceed with respect to those it wishes to accuse of crime. What emerges is a broad framework in which constitutional and statutory provisions interrelate.

In the most generalized fashion, a suspect's speedy-trial rights are protected by the applicable statute of limitations. For reasons of legislatively determined policy, prosecution is permanently barred unless commenced within the prescribed limitations period. Within that period, however, the framework of our governmental structure provides that certain other safeguards be applied on a case-by-case basis. The Due Process Clause of the Fifth Amendment forbids the government to delay the commencement of a criminal prosecution when the delay is unjustified by the legitimate needs of the investigation and/or prosecution and when it either results from a bad-faith choice of strategy on the government's part or results in the substantial impairment of the suspect's ability to erect a defense. After commencement of the prosecution, on the other hand, the Speedy Trial Clause of the Sixth Amendment requires that the Court engage in a delicate *ad hoc* balancing of the relative weight of a number of interests and considerations. *U. S. v. Ewell,* 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); *U. S. v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *U. S. v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Within the confines of the Sixth Amendment requirements, and therefore affording a broader mantle of protection to the individual suspect, are the provisions of the Speedy Trial Act, 18 U.S.C. § 3161 et seq.,[8] and of Rule 48(b).

---

7. "If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."

8. One of the legal grounds on which defendant relies is 18 U.S.C. § 3164, which directs that "persons who are being held in detention solely because they are awaiting trial" be brought to trial within ninety days of the beginning of that detention. This provision is effective even during the interim period prescribed by the Speedy Trial Act for the gradual phasing-in of the other time limits. It appears to the Court, however, that the clear design of this provision is to deal with the situation where but for the detention relative to the charges for which he is awaiting trial, the detainee would be at liberty. That does not describe the instant case.

■ The Fifth Amendment to the United States Constitution provides, in pertinent part, that "[n]o person shall . . be deprived of life, liberty, or property without due process of law," while the Sixth Amendment's first words are: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, . . . " The different operation of these two clauses, insofar as relevant to the instant inquiry, was clearly expounded in the line of cases cited above. In *Marion* and *Lovasco* the Supreme Court declared that in order to ground a delay-of-prosecution claim on the Due Process Clause of the Fifth Amendment an essential predicate is a showing that the delay has worked an actual and substantial detriment to the fairness of the trial as a device for the determination of truth; in other words, the interest toward which the Due Process Clause is directed in this regard is the defendant's interest in the fairness of the trial itself, and the defendant who seeks to avail himself of its protection must show actual prejudice to that interest. 404 U.S. at 324–26, 92 S.Ct. 455. The Sixth Amendment Speedy Trial Clause on the other hand, calls into play a wider range of interests. In passing upon a speedy-trial claim, courts are directed to assess the interplay in the particular case of four factors: (1) the length of the delay, (2) the reason(s) for the delay, (3) the assertion by the defendant of the right to a speedy trial, or his failure to assert it, and (4) the prejudice which the defendant has suffered by reason of the delay. *Barker, supra,* 407 U.S. at 530, 92 S.Ct. 2182. The prejudice which enters into the speedy-trial computation is a broader notion than the prejudice to which due-process analysis is restricted. In explaining the part which this factor is to play, the Court declared:

> "Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to

minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."

*Id.* at 532, 92 S.Ct. at 2193, citing *Ewell, supra,* 383 U.S. at 120, 86 S.Ct. 773. Thus, the Sixth Amendment guarantee takes into account not only the type of prejudice that relates directly to fairness of the trial but also other types of harm which the defendant may suffer as well.[9] The Supreme Court was forcefully explicit on this point in *Marion, supra,* 404 U.S. at 320, 92 S.Ct. at 463, where it said,

> "Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense. But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense."

*See also U. S. v. Dreyer,* 533 F.2d 112 (3d Cir. 1976); *U. S. v. Brown,* 172 U.S.App. D.C. 92, 520 F.2d 1106 (1975).

■ Whether the narrower protection of the Due Process Clause or the broader protection of the Speedy Trial Clause obtains in the given case depends on whether the investigation has ripened into a prosecution, i. e., whether the proceeding has advanced to the stage where the defendant is no longer a mere suspect but has become an accused. "[T]he Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused,' . . . " *Marion, supra,* 404 U.S. at 313, 92 S.Ct. at 459. This, in turn, does not occur until the defendant has been either arrested or indicted, whichever happens first.

■ Rule 48(b) was designed, in large part, to implement the speedy-trial guarantee of the Sixth Amendment and, while the protection it affords is broader than that of the Sixth Amendment operating *proprio vigore,* the same elements of analysis may be considered and the same type of prejudice is relevant. *See Pollard v. U. S.,* 352 U.S. 354 at 361, n. 7, 77 S.Ct. 481, 1 L.Ed.2d

---

**9.** For the sake of brevity, the former type of prejudice will be referred to herein as "direct" prejudice, while the latter type will be called "collateral" prejudice.

393 (1957); *U. S. v. Dooling*, 406 F.2d 192 (2d Cir. 1969); *cert. denied* 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224; *U. S. v. Golon*, 378 F.Supp. 516 (D.Mass.1974), *reversed on other grounds* 511 F.2d 298 (1st Cir. 1975), *cert. denied* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483; *U. S. v. Mark II Electronics of Louisiana, Inc.*, 305 F.Supp. 1280 (E.D.La. 1969). Moreover, in *Marion, supra*, 404 U.S. at 319, 92 S.Ct. 455, the Supreme Court ruled, albeit *obiter*, that the applicability of Rule 48(b) is limited to post-arrest situations. *See also U. S. v. Giacalone*, 477 F.2d 1273 (6th Cir. 1973).

In the instant case, defendant alleges no direct prejudice to his ability to defend occasioned by the delay. On the other hand, the government does not appear to dispute that he has suffered substantial prejudice of a collateral nature, although it does not concede that the harm he has suffered is of constitutional dimension. In addition, there is no substantial question of inordinate delay after return of the Indictment. The critical question, then, is whether and when defendant was "arrested," within the meaning of that term as used in *Marion*.

█ As is the case with other aspects of speedy-trial adjudication, the notion of arrest does not lend itself to a precise and generalized definition; instead, it calls for a judgment directly scaled to the facts of the given case. Arrest, then, is not a highly technical, theoretical concept, but a functional one. The question of arrest *vel non*, for this purpose, is to be resolved in large measure in terms of the event's disruptive impact on the life of the given defendant:

"Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. . . . So viewed, it is readily understandable that it is either a formal indictment or information or else *the actual restraints imposed by arrest and holding to answer a criminal charge* that engage the particular protections of the speedy trial provision of the Sixth Amendment."

*Id.*, 404 U.S. at 320, 92 S.Ct. at 463. (Emphasis added).

There are several reported cases which hold that a prisoner already in custody cannot, for purposes of speedy-trial analysis, be considered to have been arrested from the point when he was segregated from his fellow inmates following the events which later became the subject of the indictment being challenged. *See U. S. v. Clardy*, 540 F.2d 439 (9th Cir. 1976), *cert. denied* 429 U.S. 963, 97 S.Ct. 391, 50 L.Ed.2d 331; *U. S. v. Duke*, 527 F.2d 386 (5th Cir. 1976), *cert. denied* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1190; *U. S. v. Smith*, 464 F.2d 194 (10th Cir. 1972), *cert. denied* 409 U.S. 1066, 93 S.Ct. 566, 34 L.Ed.2d 519. This is so because the steps taken were designed not only to discipline the inmates but also to prevent further unrest in the general population, and related only to the internal, administrative affairs of the institution. Viewed in that light, "[s]egregated confinement for institutional reasons is not an arrest." *Smith, supra* at 196–7. Furthermore, as the Fifth Circuit observed in *Duke, supra* at 389,

"administrative segregation does not contain those incidents associated in *Marion* with arrest; that is, administrative segregation of a prisoner does not 'disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy,' etc."

*See also U. S. v. Vispi*, 545 F.2d 328 (2d Cir. 1976) [Failure to file tax returns; mere investigation does not ordinarily bring into play the considerations on which *Marion's* notion of arrest was predicated].

The Court has no desire to gainsay the opinion of these courts; indeed, it does not consider its ruling to be inconsistent with either the language or the holdings of those cases. First, it appears to this Court that defendant's incarceration at the Detention Unit under the conditions described above displayed many of the incidents of arrest delineated in *Marion*, albeit to a somewhat attenuated degree. Furthermore, the

measures taken by the prison authorities in those cases were directed to purposes other than holding to answer charges, and, as the Fifth Circuit noted in *Gravitt v. U. S.*, 523 F.2d 1211 at 1215, n. 6 (5th Cir. 1976), "[f]or purposes of determining when the right to speedy trial attaches, the *basis* for arrest is critical." (Original emphasis.) Finally, those cases were dealing with the significance to be assigned to "an internal disciplinary means of classifying prisoners, utilized under the almost total discretion of prison officials, . . ." *Duke, supra* at 390. In the instant case, defendant was placed in a position where prison officials not only did not but could not exercise their discretion over him until more than a full year after he was detained in Detroit by the FBI agents.

Nor can the Court agree with the government that the matter is governed by the provisions of 18 U.S.C. §§ 4210(a) and 4213(a)(2). The latter provision relates to the retaking of an alleged parole-violator upon a warrant; no question has been raised here as to the *legality* (as compared to the significance) of defendant's arrest; Section 4213(a)(2) is, therefore, irrelevant to the inquiry. Section 4210(a) provides:

"A parolee shall remain in the legal custody and under the control of the Attorney General, until the expiration of the maximum term or terms for which such parolee was sentenced."

The government's reasoning, it appears, is that if in contemplation of law a parolee is in the custody of the Attorney General until expiration of his sentence, an escapee is in the same position *a fortiori*. Therefore, having been in custody all along, he could not be arrested.

A review of the remaining provisions of § 4210 and of the legislative history of the act of which it is a part reveals that the purpose of the section was to provide a framework for the implementation of the due-process standards enunciated in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593,

33 L.Ed.2d 484 (1972) and *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). *See* [1976] U. S. Code Congressional and Administrative News, p. 335. The constructive-custody provision of § 4210(a) lays the jurisdictional predicate for the continuing supervision prescribed in other sections of the act. While at first blush it may appear startling that one accused of escaping from custody be said to have been in custody all along, it is more substantively anomalous that a technical provision designed to promote the effectuation of due-process safeguards afforded to those once convicted of crime be invoked to justify the summary detention and protracted delay presented here. To follow the government's logic, one would have to conclude that no prisoner or parolee would enjoy the protection of the Speedy Trial Clause before the bringing of formal charges—a proposition which strikes this Court as inconsistent with the spirit of *Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969), on which the Supreme Court relied in part in *Marion, supra*.

█ The Court is satisfied that the record, as established by defendant and rebutted by the government, is sufficient to establish that defendant was "arrested" on July 28, 1976, when agents of the FBI took him into custody. The fact (1) that he was informed by the agents that he was under arrest for escape, (2) that he was committed to the custody of the U.S. Marshal in a facility to which he had not been designated by the Bureau of Prisons, and (3) that he did not receive the benefit of a rescission hearing until he was returned to Terre Haute, over one year later, points to the conclusion that his arrest and subsequent detention related to the alleged April, 1976 escape rather than to the July, 1970 sentence. Furthermore, the Court repeats, the seizure of defendant in this case was a public act displaying many of the indicia of arrest listed in *Marion, supra*, in their most elemental form.[10] The fact that he may not

10. The Court does not intend to imply that it finds anything amiss in the arrest; for purposes of this motion, it is concerned only with the significance of the act as it relates to subsequent events.

have been lawfully at large at the time does not make the interference with his liberty any less of an arrest. Therefore, the Court concludes that the facts of this case evince "the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment," *id.*, 404 U.S. at 320, 92 S.Ct. at 463, and, *a fortiori*, the protections of Rule 48(b) as well.[11]

That being the case, now that it has been determined that Rule 48(b) *can* be applied to the instant case, the Court must still inquire into the principles and purposes of the rule in order to determine whether it *should* be applied. As was mentioned earlier herein, the application to the facts presented in this case of the doctrines of speedy-trial jurisprudence outlined above could arguably result in a finding of constitutional violation, but in the opinion of this Court the use of the less stringent requirements of Rule 48(b) are sufficient to guide decision of the question raised by the motion. It is time, then, to examine the rule and to articulate the various factors that persuade the Court to grant defendant's motion.

■ Rule 48(b) confers no new power on federal courts, but is a codification of the power inherent in all courts to dismiss for want of prosecution. Note of Advisory Committee, following Rule 48. *See Mann v. U. S.*, 113 U.S.App.D.C. 27, 304 F.2d 394

(1962), *cert. denied* 371 U.S. 896, 83 S.Ct. 194, 9 L.Ed.2d 127; *U. S. v. Jasper*, 331 F.Supp. 814 (E.D.Pa.1971), *vacated on other grounds* 460 F.2d 1224 (3rd Cir. 1972); *U. S. v. Dallago*, 311 F.Supp. 227 (E.D.N.Y.1970). It is also well settled that the scope of this power encompasses more than the redress of outright violations of the Sixth Amendment; indeed otherwise it would be superfluous. *See also U. S. v. Salzmann*, 417 F.Supp. 1139 at 1172–4 (E.D.N.Y.1976), *affirmed* 548 F.2d 395 (2d Cir. 1976); *U. S. v. Dowl, 394 F.Supp. 1250 (D.Minn.1975); U. S. v. Mark II Electronics of Louisiana, Inc., supra.*

While application of the rule is not limited to the same scope as the Sixth Amendment, cases developing Sixth Amendment doctrine offer illumination and guidance. Accordingly, the Court finds a convenient and effective analytical framework in the four factors set out in *Barker v. Wingo, supra*, which were enumerated earlier herein.

(1) Under the circumstances here presented, the length of the delay—sixteen months between the date of the alleged escape and the filing of the Indictment and a little more than twelve months between the arrest and the Indictment—is sufficient at least to trigger the inquiry.[12]

(2) As for the reasons which prompted the delay, the Assistant United States Attorney advised the Court, that:

---

11. It is not surprising that Judge Kaess reached the opposite conclusion in the course of his consideration of defendant's earlier motion, for his conclusion was not based on as full a factual record as this Court has had the benefit of in this proceeding. Had defendant received a prompt rescission hearing and had he been remanded to the custody of the Bureau of Prisons, whose officials would have had the opportunity to decide whether to administer disciplinary measures or to admit him to the general population of some specifically designated facility or to prescribe some other course of action, this would have been a quite different case and this Court would, in all likelihood, have been in substantial agreement with Judge Kaess that defendant had suffered no violation of his speedy-trial rights. Knowing then, however, what it knows now of the nature and circumstances of defendant's detention at Mi-

lan, this Court could not but have found that he had been arrested within the meaning of *Marion*.

12. "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious complex conspiracy charge." *Barker, supra*, 407 U.S. at 530–31, 92 S.Ct. at 2192. (Footnote omitted.)

"This office has not forgotten about the defendant being at Milan while awaiting a presentation of the facts to the Grand Jury. An immediate prosecution did not seem urgent since any time spent in Federal Custody would be applied against the unserved portion of the defendant's 1972 [sic] armed bank robbery sentence."

It appears, then, that the Assistant United States Attorney did not give consideration to the nature, effect and result of this *type* of incarceration; nor does it appear that he was sufficiently aware that more was at stake than the mere counting of days. As a consequence, if not forgotten, defendant was, for all practical purposes, ignored. The government's failure to act, under such circumstances, must be weighed against it.

(3) The *pro se* motion which defendant filed on May 2, 1977, while burdened with the inartfulness often found in pleadings presented by laypersons, served eloquently to alert the government to his desire for a speedy trial and attests to the earnestness of that desire. As such, it is sufficient to serve the evidentiary function of the request for a speedy trial to which the *Barker* Court adverted.

(4) Finally, the Court must consider and assess the prejudice which defendant has suffered by reason of the delay. As noted above, there has been no suggestion that his ability to defend against the charges contained in the Indictment has been impaired in any material fashion. Thus, having set out no direct prejudice to his case, defendant must show that he has suffered such collateral prejudice as to call for the drastic remedy of dismissal.

A description of the nature and incidents of incarceration at the Detention Unit at Milan FCI has been set out above. The Court agrees with defendant that the Detention Unit is the analog of a jail, and it is aware that conditions which typically prevail in jails were very much a concern of the Supreme Court when elaborating the law of speedy trial. This Court has already noted herein that in *Ewell*, and again in *Marion* and *Barker*, the Court expressly declared that one of the three interests of defendants which the Speedy Trial Clause is designed to preserve is the prevention of oppressive pretrial incarceration. In *Barker, supra*, 407 U.S. at 532–3, 92 S.Ct. at 2193 the Court expanded on that theme:

"We have discussed previously the societal disadvantages of lengthy pretrial incarceration, but obviously the disadvantages for the accused who cannot obtain his release are even more serious. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. *Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time.*" (Footnote omitted and emphasis supplied.)

Earlier in the same opinion, the Court appeared to come close to announcing that any unjustified delay would be deemed *per se* prejudicial when the defendant was incarcerated while awaiting trial. "[A] defendant confined to jail prior to trial is obviously disadvantaged by delay . . ." *Id.* at 527, 92 S.Ct. at 2190.

A finding of prejudice cannot, however, be so blithely arrived at in the instant case as the foregoing discussion would suggest, for, unlike the more typical case, prejudice is not here to be measured in terms of the difference between freedom and incarceration, but in terms of the difference between two types of custody, viz., the custody of the U.S. Marshal and that of the Bureau of Prisons, and the effects of that difference.

It cannot be declared with either particularity or accuracy what would have occurred had not defendant been held for so long a time in a limbo state relative to these charges, had he been promptly transferred back to the custody of the Bureau of Prisons. From defendant's prison history it is reasonable to suppose that he would have availed himself of the rehabilitative services and programs offered to the general prison population if he had been given the opportunity. *See* Defendant's Exhibits 1–5, 8. And it is reasonably certain that he would have received a prompt hearing on the re-

scission of his parole, in accordance with the regulations published in 28 CFR § 2.34. At the hearing he would have had the benefit of a fresher record by which to explain, justify, or otherwise account for his actions at the time of his alleged escape. Furthermore, in the ensuing year, he would have had access to the regular channels established for the consideration of a new parole request, and he would have been able to present evidence of whatever rehabilitative progress he might have achieved during that year. The Court is neither inclined nor required to speculate as to the outcome of a prompter rescission hearing, or as to the spirit with which a new parole request would have been received, or as to the degree of access which the prison officials would have allowed defendant to the facilities and programs generally made available to the general prison population. The point is that all access to all these benefits, all opportunity for him to seek to avail himself of them, was effectively foreclosed by the failure to seek an indictment promptly, which failure resulted in the defendant's serving one year of "dead time."

■■■■ Consideration of these four factors compels the Court to grant the motion to dismiss. The only remaining issue is whether the dismissal should be with or without prejudice.

■■■■■ Because the remedy is drastic and because Rule 48(b) can be used as a device for mere calendar control, it is usually assumed that a 48(b) dismissal is without prejudice to the government's right to reindict the defendant on the same charge. *U. S. v. Correia*, 531 F.2d 1095 (1st Cir. 1976); *U. S. v. Stoker*, 522 F.2d 576 (10th Cir. 1975); *U. S. v. Clay*, 481 F.2d 133 (7th Cir. 1973), *cert. denied* 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 133. It seems only proper, however, that when the order of dismissal is based on a finding of unnecessary, unjustified, and prejudicial delay, as here, the considered judgment of the court is not to be circumvented by reindictment of the de-

fendant. *See Clay, supra* (negative implication); *Salzmann, supra*, 417 F.Supp. 1139. As the Circuit Court for the District of Columbia said in *Mann, supra*, 113 U.S.App. D.C. at 29, 304 F.2d 395 at 397, "a dismissal based on a finding that the constitutional right to a speedy trial has been denied bars all further prosecution of the accused for the same offense." In addition, however, it is now widely held that federal courts possess the power under Rule 48(b) to dismiss with prejudice even absent a finding of constitutional violation. *See U. S. v. Simmons*, 536 F.2d 827 (9th Cir. 1976), *cert. denied* 429 U.S. 854, 97 S.Ct. 148, 50 L.Ed.2d 130; *U. S. v. Stoker*, 522 F.2d 576 (10th Cir. 1975); *U. S. v. Furey*, 514 F.2d 1098 (2d Cir. 1975); *U. S. v. Clay*, 481 F.2d 133 (7th Cir. 1973), *cert. denied* 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 133.

In the *Simmons* case, however, the Ninth Circuit announced a restriction on the proper exercise of that power, saying:

"[W]e hold that even though it is within the court's inherent power under Rule 48(b) to dismiss a case with prejudice for want of prosecution, not arising from a Sixth Amendment violation, such power should be utilized with caution, and only after a forewarning to prosecutors of the consequences."

536 F.2d at 836.

Following *Furey, supra*, the court indicated that the prosecutors would have been duly warned had the district court's local plan for the interim implementation of the Speedy Trial Act provided for mandatory rather than permissive dismissal with prejudice for violation of its time limits. Finding that the requisite forewarning had not been given in any fashion, the court ruled that the trial judge had abused his discretion in dismissing the indictment with prejudice and, consequently, reversed.

In *Simmons*, however, the facts were not egregious and did not disclose any of the Sixth Amendment resonances present here.[13] Indeed, it appears that the order

---

**13.** It is significant to note some of the more salient facts of *Simmons* which serve to distin-

guish it from the case *sub judice*. There the defendant, while awaiting trial, was free on

which the *Simmons* court was reviewing was based on a mere noncompliance with the local speedy-trial plan, with no showing of particularized prejudice. Here the issue does not involve noncompliance with provisions of a local plan but, rather, the fundamental concerns and functions of Rule 48(b) itself, apart from and independent of any predetermined or preimposed time-limits.

For the foregoing reasons, therefore, the Court grants his motion to dismiss and the Indictment is hereby dismissed with prejudice.

IT IS SO ORDERED.

personal recognizance. He was not arrested prior to indictment. The problem which gave rise to the trial court's ruling arose when the government, through the negligent inadvertence of the prosecutor, did not make available to defendant's handwriting expert the originals of certain critical documents until five days before trial. The defendant did not seek a dismissal, but requested only a continuance of the trial for at least one week. The Court dismissed with prejudice, *sua sponte.*