UNITED STATES of America, Plaintiff-Appellee,

v.

Sabatino CIAMMITTI (No. 82–1897), Antonio Ciammitti (No. 82–1923), Defendants-Appellants.

Nos. 82–1897, 82–1923.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 23, 1983.

Decided Nov. 7, 1983.

Neil H. Fink (argued), Detroit, Mich., Ronald A. Lustig, Southfield, Mich., for defendant-appellant in No. 82–1897.

Richard Lustig, Southfield, Mich., for defendant-appellant in No. 82–1923.

Leonard R. Gilman, U.S. Atty., Alan Gershel (argued in No. 82–1897), Thomas A. Ziolkowski (argued in No. 82–1923), Asst. U.S. Attys., Detroit, Mich., for plaintiff-appellee.

Before LIVELY, Chief Judge, JONES, Circuit Judge, and RUBIN *, District Judge.

* The Honorable Carl Rubin, Chief Judge, U.S. District Court for the Southern District of Ohio, sitting by designation.

LIVELY, Chief Judge.

These consolidated appeals present three distinct challenges to the defendants' convictions of conspiracy to manufacture methamphetamine. Since neither defendant claims that the evidence was insufficient, the facts will be recited only to the extent required to deal with the issues actually raised.

## I.

On January 18, 1980 the defendants were arrested on a charge of conspiring and attempting to manufacture amphetamine. The arrest warrant was issued on the complaint of Thomas Powell, a special agent of the Drug Enforcement Administration (DEA). When no indictment or information was filed against the defendants within 30 days of their initial appearance on the complaint, the magistrate dismissed the complaint and cancelled the defendants' bonds. This occurred on March 21, 1980. On April 15, 1982 the defendants were jointly indicted on seven counts for drug-related offenses arising out of the same events. One count charged conspiracy to manufacture methamphetamine. The defendants moved for dismissal of the charges because of preindictment delay.

### A.

The defendants do not claim a violation of the Sixth Amendment. Nor do they contend that the delay in the present case violated their due process rights under the Fifth Amendment in view of the district court's finding that the delay did not hinder their ability to present a defense. The defendants rely exclusively on Rule 48(b), F.R. Crim.P., which provides:

### Rule 48. Dismissal

\* \* \* \* \* \*

**(b) By Court.** If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint.

By its terms Rule 48(b) is discretionary and, according to the Reporter's Notes, reflects the inherent power of courts to dismiss for want of prosecution. The defendants assert that the district court abused its discretion in denying their motion and committed error in refusing to admit tendered evidence of personal hardship caused by the delay. The proffered testimony was that of the defendants' wives that their families suffered anxieties and hardships during the two-year period between arrest and indictment, and that the threat of indictment hung over them "like a sword of Damocles."

The defendants argue that the district court overlooked the fact of their 1980 arrest in holding that Rule 48(b) is inapplicable to pre-indictment delay. They rely on the statement in *United States v. Marion*, 404 U.S. 307, 319, 92 S.Ct. 455, 462, 30 L.Ed.2d 468 (1971), that Rule 48(b) "clearly is limited to post-arrest situations." (Footnote omitted). The defendants maintain that delay should be measured from their arrests on January 18, 1980 and that the "balancing test" prescribed in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), should have been applied. *Barker* recognizes four factors which should be considered in determining whether there has been a violation of the Sixth Amendment right to a speedy trial. Prejudice is one of the factors, and in the Sixth Amendment setting prejudice consisting of anxiety and concern is to be considered. The inquiry is not limited to prejudice which interferes with the defendant's ability to mount and present a defense. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193.

The government responds that Rule 48(b) does not apply to the period between arrest and indictment where the charges have been dismissed subsequent to arrest. The prompt dismissal of all charges after arrest required that the delay before indictment be tested by due process standards under guidelines established in *Marion* and *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the government

contends. Under those guidelines, the government argues, dismissal is not required upon a showing of the type of hardship relied upon by these defendants. Therefore, it was not error to exclude the testimony of the defendants' wives.

## B.

Rule 48(b) comes into play when there is unnecessary delay in presenting a charge to a grand jury "against a defendant who has been held to answer to a district court ...." In this case we have defendants who were held to answer charges in 1980. However, the charges were not pending during the entire period between their arrest and their indictment. In fact, they were pending only from January 18 until March 21, 1980. None were pending from March 21, 1980 to April 15, 1982. This fact is significant. In *United States v. MacDonald*, 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), the Supreme Court held that the Sixth Amendment right to a speedy trial does not apply to a period between the dismissal of charges and the institution of new charges:

> Once charges are dismissed, the speedy trial guarantee is no longer applicable. At that point, the formerly accused is, at most, in the same position as any other subject of a criminal investigation. Certainly the knowledge of an ongoing criminal investigation will cause stress, discomfort, and perhaps a certain disruption in normal life. This is true whether or not charges have been filed and then dismissed. This was true in *Marion*, where the defendants had been subjected to a lengthy investigation which received considerable press attention. But with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending. After the charges against him have been dismissed, "a citizen suffers no restraints on his liberty and is [no longer] the subject of public accusation: his situation does not compare with that of a defendant who has been arrested and held to answer." *United States v. Marion*, 404 U.S., at 321 [92 S.Ct., at 464].

Following dismissal of charges, any restraint on liberty, disruption of employment, strain on financial resources, and exposure to public obloquy, stress and anxiety is no greater than it is upon anyone openly subject to a criminal investigation.

*Id.* at 8–9, 102 S.Ct. at 1502 (footnotes omitted). Chief Justice Burger summarized the Court's holding by pointing out that once the first set of charges against the defendant were dismissed he "was legally and constitutionally in the same posture as though no charges had been made." *Id.* at 10, 102 S.Ct. at 1503 (footnote omitted).

The defendants contend that *MacDonald* applies only to Sixth Amendment claims and that Rule 48(b) has a broader reach than the constitutional requirement. They point out that various courts have applied the *Barker v. Wingo* balancing test to Rule 48(b) cases. The defendants argue that the district court erred in refusing to receive and consider evidence of personal hardships brought about by delay. We note that the cases relied upon by the defendants involved facts which were quite different from those found in the record before us. For example, the defendant in *United States v. McLemore*, 447 F.Supp. 1229 (E.D. Mich.1978), had been in custody for more than a year prior to his indictment. In *United States v. Starr*, 434 F.Supp. 214 (D.D.C.1977), the court found that serious prejudice had been caused to the defendants' ability to defend themselves because two important witnesses had disappeared in the 13 months between arrest and indictment. In this case the defendants were not incarcerated and were not subject to bail requirements; the charges had been dismissed and their bonds cancelled. Under *MacDonald* prejudice of the type which the defendants sought to establish is insufficient to require dismissal. The defendants do not claim unnecessary delay between their indictment and their trial. They focus on the period between arrest and indictment, most of which need not be considered with respect to their claim of personal hardship because there were no charges pend-

ing. The district court did not err in excluding evidence of anxiety and concern which resulted only from the fact that the defendants were under criminal investigation. Like the defendant in *MacDonald,* they were in the same position as if no charges had been made. The defendants concede that they were unable to establish actual prejudice to their ability to defend or intentional delay to gain some tactical advantage or to harass them. *See United States v. Marion, supra,* 404 U.S. at 325, 92 S.Ct. at 466. Under the circumstances presented in this case it was not an abuse of discretion to deny the motion to dismiss. *Cf. United States v. Giacalone,* 477 F.2d 1273 (6th Cir.1973).

## II.

Several DEA agents searched the defendant Antonio Ciammitti's residence on January 18, 1980 and seized drug-related materials and paraphernalia. Both defendants filed a motion to suppress evidence seized during the search, claiming that the search was illegal. The search was conducted pursuant to a warrant issued on the basis of an affidavit by DEA agent Thomas Powell. In paragraph 2 of the affidavit Powell stated that on December 11, 1979 he and another agent "observed" Antonio Ciammitti and another person obtain from a Columbus, Ohio establishment chemicals and laboratory equipment which could be used to manufacture controlled substances. In paragraph 6 Powell stated that he "observed" a person believed to be an employee of the chemical supply firm deliver chemicals and laboratory equipment to Antonio Ciammitti on December 23, 1979. In paragraph 7 of the affidavit Powell stated that on January 14, 1980 he "observed" Antonio and Sabatino Ciammitti load certain chemicals into an automobile previously seen at the Antonio Ciammitti residence in Riverview, Michigan. The affidavit detailed surveillance of the delivery of the "observed" chemicals and equipment to the Antonio Ciammitti residence in Riverview, Michigan.

The defendants contend here, as they did unsuccessfully in the district court, that Agent Powell did not actually observe any chemicals or equipment; that everything he saw delivered on December 23 or loaded into vehicles on December 11 and January 14 was enclosed in cartons. Thus they argue that the affidavit contained false statements without which no finding of probable cause could have been made by the magistrate. They rely on *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), where the Supreme Court held that the Fourth Amendment requires a hearing upon the validity of a search warrant where a defendant makes a substantial preliminary showing that the warrant affidavit contains a statement essential to the establishment of probable cause which is false and knowingly and intentionally made, or is made with reckless disregard for its truth.

The district court held that the defendants in the present case had not made a substantial preliminary showing, but nevertheless conducted a hearing on the issue. At the hearing Powell testified that he personally observed the chemicals immediately prior to each delivery and he knew from conversations with the head of the chemical supply firm and from examining invoices that these chemicals were to be delivered to the Ciammittis. He saw some of the chemicals being placed in cartons which resembled those later loaded into the Ciammitti vehicles. The chemicals were in original packages which bore identifying labels. The district court found that the statements in the affidavit were not knowingly and intentionally false, though Powell could have been more precise in stating what he knew.

The district court did not err in denying the motion to suppress on the basis of the warrant affidavit. The entire argument for suppression is based on use of the word "observed." We do not believe Powell sought to mislead the magistrate by making a false statement or that he acted recklessly. A fuller statement of the sources of his information would have been desirable. He used a word in an imprecise manner, but he entertained no doubt that it truthfully con-

veyed his knowledge—that the defendants did purchase and take delivery from the Columbus firm of the chemicals and equipment described in the warrant and did transport these purchases to the Antonio Ciammitti residence. Powell also stated in the affidavit that he and other agents watching the Ciammitti house had detected odors associated with the production of amphetamine emanating from the house during the night when lights appeared only in the basement and in one upstairs room. The statements in the affidavit clearly satisfied the requirement that statements be "truthful" as defined in *Franks*—"that the information put forth is believed or appropriately accepted by the affiant as true." 438 U.S. at 165, 98 S.Ct. at 2681.

It must be remembered that the affidavit was prepared shortly after Powell and two other agents detected odors associated with the manufacture of amphetamine near the Ciammitti residence. It was drafted "in the midst and haste of a criminal investigation," *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), and was not "purely conclusory," stating only the affiant's belief that probable cause existed. *Id.* It sufficiently detailed the facts required for the magistrate to make a determination of probable cause. The Supreme Court has recently reaffirmed its earlier holdings that the validity of search warrants is to be determined on the totality of circumstances surrounding their issuance rather than by applying any set of rigid requirements. *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Viewed in this manner the affidavit and warrant in this case pass muster.

### III.

■ As an additional ground for suppression of evidence the defendants contend that the DEA agents who searched the residence of Antonio Ciammitti violated 18 U.S.C. § 3109 in executing the search warrant. Section 3109 provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein,

to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

After conducting an evidentiary hearing on the motion to suppress the district court made the following findings:

We find that approximately eight DEA agents, accompanied by approximately three Riverview policemen, approached the Ciammitti house at 12:15 a.m. on January 18, 1980. The only light in the house visible from the outside was a light shining through a basement window on the right side of the house. Nora Ciammitti was sitting in the family room, her husband Antonio was not home, and her four children were asleep in their bedrooms. Sabatino Ciammitti was in the basement. Most agents approached the house from the front door, although several were assigned to the back and sides. Agent Powell pounded loudly on the front door, and yelled that they were federal agents with a search warrant who wanted to be admitted. After pounding on the door for approximately 15 to 30 second[s] without receiving a response, agents started to break the door down with a battering ram. At about the same time, agents stationed at the right side of the house heard noise in the basement, broke in the basement window, and pulled their guns on Sabatino Ciammitti whom they saw through the window.

Nora Ciammitti approached the front door after hearing the noise outside. Once the agents with the battering ram had broken a hole through the door, agent Minger was able to see Nora Ciammitti standing inside the door. Ms. Minger told the other agents what she saw and persuaded them to stop battering the door. The agents then identified themselves as federal agents with a search warrant and demanded that Nora Ciammitti open the door. After encountering some difficulty unhooking the latch, she opened the door and admitted the agents. The agents remained at the house for

several hours; all agents who entered the house did so through the front door.

The district court found that the agents were unwarranted in believing they had been denied admittance after waiting 15 to 30 seconds and that they should not have attempted to break down the door. However, the court denied the suppression motion upon finding no causal connection between the violation and seizure of the evidence. The district court reasoned that although breaking a hole in the door violated § 3109, Mrs. Ciammitti complied with the demand that she open the door and all the agents entered through the opened door. The defendants rely principally on *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), in arguing that suppression should have been granted. However, we find *Miller* distinguishable in several respects. The officers in *Miller* had no warrant and they never expressly demanded admission or stated their purpose. The Court found that when asked, "Who's there?" one officer said "Police" in a low voice. In the present case the district court found that the agents identified themselves, stated their purpose and demanded entry in a loud voice. The district court credited the testimony of Agent Patricia Minger that when, through the hole, she saw Mrs. Ciammitti approaching the door, she advised the other agents that there was a woman inside and they stopped battering the door. The agents again identified themselves, stated their purpose and demanded that the door be opened. The door was opened, and the agents entered and conducted the search which produced incriminating evidence.

Though the district court found no causal connection between the breaking of the door and the agents' entry into the house, we do not believe this determination was necessary. Given the knowledge they had of the activities in the basement we find that the agents were justified in concluding that their summons was being ignored. Thus, we conclude there was no violation of § 3109. While they waited for a very brief time after the first demand before starting to break the door the agents ceased the battering when they knew someone was answering their summons.

The search in this case was the culmination of several months of investigation and surveillance. The officers had probable cause to believe that the chemicals and equipment were in the residence to be searched. They obtained a warrant, and following entry through the opened door found a complete laboratory for the production of methamphetamine in the basement of the Ciammitti residence. Suppression of this evidence was not required under the facts of this case.

It is somewhat ironic that the dissent faults the majority for mentioning what was actually discovered after the house was entered. The entire thrust of the dissent is that it was unreasonable to expect Nora Ciammitti "or any reasonable woman" with four children sleeping in their bedrooms to have left the family room at 12:15 in the morning and to open the front door within a half minute. Of course this assumes that the officers knew that Mrs. Ciammitti was the only adult on the ground floor of the house, knew that she was in the family room and knew that she had four children in her care sleeping in the bedrooms. In fact, none of these things were known by the officers when they concluded that their summons was being ignored. This information all came to light after the officers entered the house and could not have been considered in making their decision to break the door.

What the officers did know was that chemicals and equipment for the manufacture of illegal drugs had been taken into the house by *two men.* They also knew that odors associated with the production of these drugs had been detected coming from the basement on previous nights when the basement lights were on. They knew that the basement lights were on when they approached the front door. While demanding entry at the front door Agent Powell heard the agents on the side of the house breaking the window and yelling to someone, "Freeze."

We did not refer to the fact that the officers had probable cause and to the results of the search to raise the implication that the existence of probable cause or the results of the search can justify ignoring § 3109. These facts were recited only to show that the agents in this case had done a careful and thorough bit of police work before moving against the defendants. The entry into the house was the culmination of months of effort. Unlike the officers in *Miller* they had obtained a search warrant. Also, unlike the officers in *Miller* they announced their identity and purpose at least twice in voices that could be heard inside the house. We conclude that they acted reasonably in assuming they had been refused admittance considering all the circumstances.

The judgment of the district court is affirmed.

NATHANIEL R. JONES, Circuit Judge, dissenting.

Although I agree with the majority's excellent disposition of the 48(b) and the *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) issues, I cannot in good conscience concur in its treatment of the 18 U.S.C. § 3109 violation. § 3109 provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, *to execute a search warrant, if, after notice of his authority and purpose he is refused admittance* or when necessary to liberate himself or a person aiding him in the execution of the warrant.

(emphasis added). As the majority makes clear, the district court found that the agents were not warranted in breaking into the house because a "reasonable person" would not think that a delay of 15 to 30 seconds in answering the door at 12:15 in the morning would constitute a denial of admittance. The majority fails to make clear, however, that the district court explicitly found that the officers' actions in this case violated § 3109.

Contrary to this explicit finding and contrary to what I feel is any reasonable reading of the facts of this case, and without challenging the factual elements found by the district court, the majority concludes that "there was no violation of § 3109." The majority observes that the agents waited a "very brief time after the first demand before starting to break the door." This conclusory statement merely glosses over a relevant and critical fact. The agents, in fact, allowed Nora Ciammitti less than one half of one minute at that hour of the night to answer her front door. I am unable to believe that it was reasonable to expect that this or any individual could have, or *would have*, unlocked the front door at 12:15 in the morning to a group of yelling and pounding strangers—and do so within one half of one minute. Certainly no reasonable law enforcement agent should have sensibly expected that a 15 to 30 second delay in answering the door at that hour constituted a denial of admittance. The district court, from this factual scenario, explicitly found that the agents were unwarranted in believing that they had been denied admittance.

I do not know how it can now be concluded from these same facts that the "agents were justified in concluding that their summons was being ignored." For that reason I can not join in a holding which sanctions the use of police authority, under these circumstances, to batter a hole through the front door of a private dwelling in the wee hours of the morning. I am precluded from approving this type of law enforcement by my view of the law which mandates a respect for the privacy of an individual in one's own home. The picture drawn by the majority of the events at Nora Ciammitti's home in justification of the physical destruction of private property at 12:15 a.m. is inconsistent with my view of the record. Neither does it square with that of the district court. As the district court found, the agents were unwarranted in believing that they had been denied admittance, and their breaking and entering of the Ciammitti home violated § 3109.

Facts known to the agents before, or facts discovered by them after the battering of the Ciammitti's door cannot pardon the clearly unlawful police conduct that took place here. The majority excuses the agents' behavior because of the "knowledge they had of the activities in the basement." But I fail to see the relevance of the agents' prior knowledge to their wanton and reckless disregard for private property. Section 3109 does *not* provide that an officer, in executing a warrant, may break into a home if he is refused admittance or *if he has done a careful and thorough bit of prior police work.* The very language of § 3109 assumes that the officer who breaks into a dwelling is doing so to execute a lawfully obtained "search warrant" based upon probable cause. Thus every officer who violates § 3109 does so with sufficient knowledge of activities in the dwelling to constitute probable cause. To hold, as the majority holds, that because the officers knew of the "activities in the basement" and had "probable cause to believe that the chemicals and equipment were in the residence," they were justified in believing that they had been "refused admittance" is to render § 3109 a complete nullity. I therefore do not agree with the majority's reliance upon the agents' "knowledge" of possible lawless activity to justify their lawless conduct.

Nor can I understand the apparent reliance upon the items discovered *after* the door was broken to sanction the prior unlawful police activity. For instance, the majority concludes its opinion by observing that evidence of illicit activity was indeed found at the searched home:

> They ... found a complete laboratory for the production of methamphetamine in the basement of the Ciammitti residence. Suppression of this evidence was not required under the facts of this case.

The majority not only suggests that unlawful police conduct can be forgiven by successful crime prevention, it also implies that successful police activity cannot be unlawful. I find no acceptance of or authority for this implication in the holdings of the Supreme Court or of this Court. I recognize that the exclusionary rule, which is

perceived as "letting criminals get off with murder," is under serious attack. Yet, whatever feelings many in the nation harbor for the exclusionary rule, that rule *remains* the legal policy of this country, *see Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the legal policy of this Circuit, *see United States v. Hatcher,* 680 F.2d 438 (6th Cir.1982) and the legal policy to be specifically applied in cases where § 3109 has been violated. *See Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

Finally, I disagree with the effort to distinguish *Miller* from the case at bar. Such an effort is unnecessary because the parties agree that there are clear factual discrepancies between these cases.

I deem *Miller's* legal import to be entitled to far greater weight than the majority is able to lend. Like the majority, the *Miller* Court was "duly mindful" of the need for "law and order." I note, however that *Miller* went on to conclude:

> insistence on observance by law officers of traditional fair procedure requirements is, from the long point of view, best calculated to contribute to that end.

357 U.S. at 313, 78 S.Ct. at 1197. Like the majority, the *Miller* Court was tempted to condone an otherwise unlawful search because it was successful. *Miller* withstood that temptation by observing:

> We have had frequent occasion to point out that a search is not made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success.

357 U.S. at 312, 78 S.Ct. at 1197; *Citing United States v. Di Re,* 332 U.S. 581 at 595, 68 S.Ct. 222 at 228, 92 L.Ed. 210. Like the majority, the *Miller* Court understood the pressures inherent in police activity. I am more comfortable with and impressed by the deeper understanding manifested by the *Miller* court:

> Congress, codifying, a tradition embedded in Anglo-American law, has declared in § 3109 the reverence of the law for the individual's right of privacy in his house.

357 U.S. at 313, 78 S.Ct. at 1198. Finally, like the majority, the *Miller* Court wished that police conduct would remain lawful and that the judicial system would retain integrity without the aid of sanctions against lawlessness and duplicity—and so do I. Yet, we know that is not always possible. This is one of those times. Therefore, as *Miller* instructs:

> The evidence seized should have been suppressed.

357 U.S. at 314, 78 S.Ct. at 1198. In view of *Miller,* § 3109 and the facts of this case, I respectfully dissent.