UNITED STATES of America

v.

Ron RICHBURG.

UNITED STATES of America

v.

Wesley R. BRADFORD et al.

UNITED STATES of America

v.

SOUTHWESTERN PETROLEUM CORPORATION et al.

Nos. 76–82–NA–CR, 78–30182–NA–CR and 79–30024–NA–CR.

United States District Court,
M. D. Tennessee,
Nashville Division.

April 4, 1979.

Joe B. Brown, William M. Cohen, Asst. U. S. Attys., Nashville, Tenn., for plaintiff.

James W. Price, Jr., Clark H. Tidwell, Robert H. Schwartz, Charles A. Leach, William H. Farmer, Nashville, Tenn., James J. Warner, San Diego, California, D. Dudley Oldham, Houston, Texas, for defendants.

## MEMORANDUM

MORTON, Chief Judge.

Movants Bradford, Ellingson, LaMasters, Richburg, Sands, and Smith were indicted in August 1978 in a thirty-one count indictment charging that during their alleged participation in a fraudulent commercial enterprise known as LOC Industries (hereinafter referred to as LOC), they violated and conspired to violate the federal mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. The crimes with which movants have been charged were committed before December 18, 1975. Movants contend that the government's thirty-two month delay in bringing the charges entitles them to have the indictment dismissed.

LOC was operated in Nashville, Tennessee, throughout most of 1975. It was formed as a vehicle for selling regional distributorships for "Seal-Tite," a tire puncture-proofing sealant of questionable effectiveness, and for other equally suspect chemical products. Distributorships were routinely sold on the basis of misrepresentations about the effectiveness of the products, the financial rewards to be gained from owning a distributorship, the exclusivity of the territory of the distributorship, and the amount of field support and advertising that LOC would provide the distributor. Other than the management level officials of the company, LOC employed tele-

phone solicitors to make the initial contact with prospective distributors; salesmen to make the sales presentation to the prospect in person; "singers" who, posing as successful and enthusiastic distributors, made unfounded endorsements of the LOC products to encourage prospects to buy a distributorship; "heat men" to handle the flood of phone calls from irate distributors who were disgruntled over the failure of LOC to fulfill its promises; and various other personnel. During its operation, the LOC enterprise managed to sell $4.4 million of distributorships to over 1,000 victims across the nation.[1]

On December 18, 1975, LOC's activities were abruptly terminated when the FBI raided the company's headquarters, made arrests, and seized a large quantity of the company's records and other evidence. Arising out of this raid and the related FBI investigation, an indictment was returned on April 12, 1976, charging five corporations and thirty individuals with essentially the same offenses as those with which the present movants have been charged. Twenty-one defendants pleaded guilty and eleven were convicted as the result of a month-long trial which ended on September 16, 1976. Two of the original defendants had not been apprehended at the time of the trial. One of these two, movant Richburg, surrendered himself to federal authorities in May 1978, and several months later he was reindicted in a superseding indictment. The other five movants, who had not been charged in the first case, were indicted along with him. The case is presently before the court on movants' motions to have the indictment dismissed. A hearing on these motions was held on December 7 and 21, 1978, and January 4, 1979.

■ All six movants have made motions to dismiss the instant indictment on the ground that the government's delay in obtaining the indictment violated their right to due process of law under the fifth amendment. Pre-indictment delay has been discussed by the United States Supreme Court in two opinions, *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), in which the Court recognized pre-indictment delay as a proper ground for dismissal of indictments in certain circumstances. The Court there stated that although statutes of limitations are the primary guarantees against the government's bringing overly stale charges, the due process clause plays a limited role in protecting against prosecutorial delay. Even if the applicable statute of limitations has not expired, due process requires dismissal of indictments when the delay in bringing formal charges is unjustified by the legitimate needs of the prosecution and causes the defendant to suffer actual substantial prejudice.[2] Movants have made allegations and put on proof to support their claims that both of these elements, unjustified delay and actual substantial prejudice, are present in this case.

Movants have asserted a variety of ways in which they claim to have suffered actual

1. For a more thorough discussion of LOC's modus operandi, *see United States v. Smith,* 561 F.2d 8 (6th Cir. 1977).

2. Movants contend that a showing of actual prejudice is not always required, especially when the government has caused the delay in bad faith. *See, e. g., United States v. Giacalone,* 477 F.2d 1273 (6th Cir. 1973); *United States v. McLemore,* 447 F.Supp. 1229 (E.D. Mich.1978). In the *McLemore* case, which was decided on the basis of Rule 48(b) of the Federal Rules of Criminal Procedure, rather than the due process clause, the court stated that:

[t]he Due Process Clause of the Fifth Amendment forbids the government to delay the commencement of a criminal prosecution when the delay is unjustified by the legitimate needs of the investigation and/or prosecution *and* when it *either* results from a bad-faith choice of strategy on the government's part *or* results in the substantial impairment of the suspect's ability to erect a defense. *United States v. McLemore, supra,* 447 F.Supp. at 1233 (emphasis added). Later in that opinion, however, the court recognized that under *Lovasco* a showing of actual prejudice is an *essential* rather than an *alternative* requirement for dismissal of an indictment for pre-indictment delay under the due process clause. *Id.* at 1234. This court is convinced that *Lovasco* requires both actual prejudice and unjustified delay in all cases.

prejudice because of the delay. Movants Bradford, Ellingson, LaMasters, and Smith claim to have lost personal records that they kept concerning their employment at LOC and which they claim would have materially aided them in preparing their defenses to these charges. The same four are joined by movant Smith in claiming that their memories have faded to the point that they have little or no independent recollection of the events that are the subjects of the indictment and that this detrimentally affects their ability to defend themselves. Movants Bradford, Sands, and Smith claim that because of the delay, potential defense witnesses are either difficult to locate or suffering from dimmed memories. Movants LaMasters, Richburg, and Smith claim that they have been actually prejudiced because they have suffered anxiety, apprehension, concern, inconvenience, and restraint of liberty.

■■ This latter claim of various types of psychic trauma brings into focus the issue of what interest of an accused the due process clause protects. From *Marion* and *Lovasco* it is apparent that the accused's interest in the "fairness of the trial as a device for the determination of the truth," *United States v. McLemore*, 447 F.Supp. 1229, 1234 (E.D.Mich.1978), or, stated differently, his interest in preserving his ability to defend himself against the charges, is the interest protected by the due process clause. Thus, only actual prejudice to this interest is sufficient to satisfy this element of a due process claim. On the other hand, infringement of an accused's interest in not being subjected to anxiety and apprehension by the bringing of criminal charges has no bearing on the fairness and reliability of the trial process. While such collateral interests are among those that the speedy trial clause of the sixth amendment was designed to protect, *see, e. g., Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *United States v. Marion, supra*; *United States v. McLemore, su-*pra, since one can normally live under a "cloud of anxiety, suspicion, and often hostility" and still put forward his best defense to the accusation, those interests fall outside the scope of protection afforded by the due process clause of the fifth amendment. Therefore, this claim is irrelevant to the three movants' showing of actual prejudice. As movant Richburg has asserted no other basis for a finding of actual prejudice, his motion to dismiss for pre-indictment delay is denied.

■ The other ways in which movants claim to be prejudiced do not suffer from the same infirmity as the claim of anxiety and apprehension. Loss of records, loss of personal recollection, and loss of witnesses or witnesses' memories all relate to the ability of an accused to defend himself against the charges. If proven, they affect the fairness and reliability of the trial process itself and thus fall within the core of the due process protection.

■ Other problems are presented. The Supreme Court in *Marion* and *Lovasco* stated that parties claiming a due process violation must demonstrate "actual" as distinguished from "possible" prejudice. The Court did not, however, state what would constitute a showing of "actual" prejudice. In its only opinion on the subject, the Sixth Circuit indicated that it would at least require that the defendant show that the lost evidence would have been related to the offense charged. *United States v. Swainson*, 548 F.2d 657 (6th Cir. 1977). Some other courts have been very strict in requiring the defendant to show the specific content of the lost evidence and precisely how that evidence would have contributed to his defense. *See, e. g., United States v. Mays*, 549 F.2d 670 (9th Cir. 1977). The court in *Mays* further stated that proof of those items solely by the affidavits of the defendants themselves was insufficient.[3] Other courts have been less stringent and have

---

**3.** The harshness of this ruling was mitigated somewhat by the court in a footnote: "The lack of supporting evidence would perhaps not be considered as adversely to the defendants in a situation where they had no notice of the possibility of criminal indictments." *United States v. Mays, supra*, 549 F.2d at 679 n.17.

required no more proof than defendant's own testimony about how the lost evidence would have assisted him. *See, e. g., United States v. Lovasco,* 532 F.2d 59 (8th Cir. 1976), *rev'd on other grounds,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). The very rigid approach seems to this court, however, to be unsatisfactory. When making claims of prejudice caused by loss of evidence, defendants often encounter difficulty in substantiating such claims and courts experience difficulty in evaluating them because of the very real danger that "what has been forgotten [or lost] can rarely be shown." *Barker v. Wingo, supra,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. As stated in *Ross v. United States,* 349 F.2d 210 (D.C.Cir.1965), "In a very real sense, the extent to which [the defendant] was prejudiced by the Government's delay is evidenced by the difficulty he encountered in establishing with particularity the elements of that prejudice." *Id.* at 215. In light of this, it would appear that in adopting the rigid approach, a court predetermines an outcome adverse to defendants in all but very rare cases. This court believes that it comports more with the realities of such situations to require the defendant to demonstrate the general content of the lost evidence and show that it had a material connection with his defense to the crimes charged. *See United States v. Mays,* 549 F.2d 670, 682 (9th Cir. 1977) (Ely, J., dissenting). Such an analysis of the proof offered in support of the motions to dismiss seems best suited to reconciling the defendant's inability to produce concrete evidence of what no longer exists [4] with the need of the court to be satisfied that defendant's claim is legitimate.

■ Under the standard just discussed, the movant, to prove that his ability to defend has been actually prejudiced by a loss of records, must show generally the contents of the records and how they would have been connected to his defense. Furthermore, it must appear that there is no substitute source for the information contained in those lost records. For example, in this case the government has in its possession a wealth of information, much of it seized from LOC headquarters during the raid in December 1975, that is available to the movants, including: the LOC "pitch book," which is allegedly rife with fraudulent misrepresentations and which was an integral part of sales presentations; verification sheets for all sales containing the dates of the sales, the names of the salesmen, and the amounts of commissions paid to salesmen for each sale; sales contracts containing dollar amounts of product sales, signatures of buyers and salesmen, and other basic standard form matter; call sheets made by telephone solicitors showing all appointments set up for salesmen; and FBI interviews with and questionnaires completed by LOC customers. If movants' records contained no more information than presently exists in the government's files, the claims of actual prejudice caused by the loss of those records will fail. Finally, because the prejudice must have been caused by the delay, the movant must show that the loss of records is directly traceable to the government's delay and not produced by movant's deliberate attempt to destroy evidence or his negligence in failing to guard his own interests.

■ Movant Bradford testified that the records he lost consisted of notes, made directly after each sales presentation, of what he and his prospective customers said during the presentation. Bradford explained that this record-keeping was part of a self-improvement technique that he developed during his years as a salesman for various companies. He stated that his LOC notes included memoranda of statements he made that were not contained in the standard "pitch," such as his responses to objections that customers made and the aspects of his presentation that he emphasized, as well as questions that customers raised that he was unable to answer, the portions of

---

4. "[I]n the overwhelming number of cases . . . the burden of summoning affidavits from buried bodies or dimmed minds will be insur- mountable." *United States v. Mays, supra,* 549 F.2d at 682 (Ely, J., dissenting).

the presentation that were most effective, and similarities among various prospective customers. Bradford contends that this information would have materially aided his defense. He claims that he believed both the product and the entire LOC marketing program to be legitimate and that the contents of his notes would have reflected that state of mind, thus bolstering his defense of innocence of any intent to defraud. He also believes that the notes would have refreshed his memory of contacts with customers and would have provided a basis from which he could have conducted more complete and effective cross-examination of prosecution witnesses. The court believes that in light of Bradford's testimony about the details of the notes and their connection with his defense, the loss of records by this movant resulted in actual prejudice to his ability to defend. Furthermore, because his notes included statements made by Bradford that were not part of the "canned pitch," recorded when his memory of them was freshest, the court believes that there is no substitute source from which he can obtain their contents. Finally, Bradford further testified that the records were last seen in February 1977 and were apparently lost when he moved to his present home in Monroe, Louisiana, in May 1977. Since the loss occurred over one year after the original LOC indictment and over six months after the conclusion of the first LOC trial, a time during which Bradford had no reason to believe that the records would be of any further usefulness to him, the court believes that the loss is directly traceable to the government's delay rather than to movant's negligence in protecting his interests. Therefore, because movant Bradford has made the requisite showing as to each element, the court is satisfied that his loss of records has caused him to suffer actual substantial prejudice.

Movant LaMasters testified that he lost a green record book in which he kept a record of everyone he saw during his LOC employment. The book contained such information as who bought and who did not, why a prospective customer did not buy, physical descriptions of those who did buy, the quantity of product purchased, and whether a customer was "gung ho" or skeptical. It was affirmatively represented to this court that movant did not always use the standard LOC "pitch" and that he often made statements that were not contained in the "pitch"; and it was contended that the lost notes would probably have reflected those statements. LaMasters, like Bradford, claims that he believed that LOC was a bona fide business enterprise and that Seal-Tite was a legitimate and effective product. He contends that his lost notes would have had a material connection with his defense in that they likely would have reflected his state of mind and his lack of any intent to defraud. The notes could also have assisted his defense by providing a basis for effective cross-examination. In light of all these circumstances, the court finds that the lost notes could have materially assisted movant's ability to defend against the charges. Although the government's files can supply movant with some of the missing information, such as the identities of purchasing customers and the quantities they bought, there is no substitute for the lost records concerning why certain prospects did not buy the product and whether the customers were enthusiastic or reticent, and there is no way that the government's files can reflect statements made by movant that were not contained in the "pitch book." Furthermore, LaMasters testified that shortly after the FBI raid at LOC headquarters, he contacted the FBI in an effort to cooperate with their investigation. On April 8, 1976, he was interviewed by an FBI agent about his LOC employment. At the beginning of the meeting, LaMasters was "advised that he was not considered as a subject concerning this matter. LaMasters thereafter voluntarily answered questions . . . ." *See* Exh. 8, Hearing of December 21, 1978. At the conclusion of the interview, the agent told LaMasters that he doubted that LaMasters would hear anything further from the FBI and that he had no reason to worry about the LOC prosecution. In reliance upon the FBI agent's representations that he was not a target of the

LOC investigation and that he had nothing to worry about, LaMasters, several months later, threw away his LOC records. The court believes that although movant did deliberately destroy the records, he did so in justifiable reliance upon the statements of the government agent and without any ulterior intent. In light of this showing, the court finds that movant LaMasters has suffered actual substantial prejudice from the loss of his records.

■ Movant Sands' claim stands in a different light than do those of Bradford and LaMasters. Sands asserted in his affidavit that he had lost records that would have been pertinent to his defense. At the December 7, 1978, hearing, however, movant's responses to the questions of the court revealed that his only records were of the dollar amounts of his sales and the commissions he received from those sales. Even if this information were relevant to his defense, complete sales and commissions records are obtainable from the government's files. Therefore, no actual substantial prejudice has resulted from Sands' loss of records.

■ Movant Ellingson also claims actual prejudice based upon his loss of records pertaining to his LOC employment. Ellingson testified that his records were still in his possession at the time of his arrest in August 1978. Three or four days later, however, his wife, with full awareness of his indictment, destroyed those records. Although prejudice may have resulted from this unfortunate event, it is not attributable to the government's delay in bringing the indictment. In spite of the delay, Ellingson still had his records when he learned of the charges against him. Therefore, any prejudice from the loss does not help movant establish a violation of due process. The court does not reach this conclusion solely on the basis of the fact that the loss occurred after the return of the indictment. Many times a loss of evidence subsequent to a return of an indictment, such as the death of a primary defense witness or destruction of exculpatory evidence by unavoidable natural disaster, may be directly traceable to

the government's pre-indictment delay. In those cases, the defendant would have no ability to prevent the loss. In the instant case, however, at the time he was arrested and thereby put on notice of the importance of preserving his records, Ellingson was in a position to take reasonable precautions to prevent the loss of the records. Thus the loss cannot be said to have been caused by the pre-indictment delay.

■ Movants Bradford, Ellingson, LaMasters, Sands, and Smith all claim that they have suffered actual substantial prejudice caused by the government's delay in that their memories of the events alleged in the indictment have dimmed to the point that they cannot recall the transactions sufficiently to prepare their defenses. The court believes that it is possible for a criminal defendant's ability to defend himself to be prejudiced by a genuine lack of memory about the crucial events. *See, e. g., United States v. Quinn,* 540 F.2d 357, 362 (8th Cir. 1976); *United States v. Cowsen,* 530 F.2d 734, 736 (7th Cir. 1976); *United States v. Alred,* 513 F.2d 330, 332 (6th Cir. 1975). However, the veracity of a claim of faded memory can rarely be satisfactorily tested prior to trial, *United States v. Cowsen, supra,* especially when, as here, the claim is supported solely by movants' own testimony and affidavits. At trial, on the other hand, defendants have a greater motivation to remember events of the past and may be able to recall from obscurity more detail than they have claimed heretofore would be possible. Certainly it would be unwise for a defendant to remain mute during trial about events that might tend to exculpate him simply in order to maintain an artificial claim of dimmed memory. Therefore, the court believes that movants' claims of actual prejudice based on this ground are premature. If defendants wish to renew these claims at the close of the evidence at trial, the court will evaluate them more thoroughly at that time.

Three movants, Bradford, Sands, and Smith, claim that they have suffered actual prejudice because potential defense witnesses are either lost and difficult to locate or

are afflicted with faded memories. Neither Bradford nor Smith presented any proof to support their claims. Sands admitted that he had not even attempted to locate or contact any of these alleged witnesses. The court therefore finds that movants have failed to carry their burdens of proving actual prejudice based upon this ground.

To summarize, the court is convinced that movants Bradford and LaMasters have presented credible claims of actual substantial prejudice based upon their loss of records. They have thus established the first element of their due process claims. In order for them to prevail on their motions to dismiss the indictment, however, a second element must be established: that the government's delay in obtaining the indictment was not justified by the needs of an ongoing investigation of the crime, see *United States v. Lovasco, supra,* or any other legitimate need of the prosecution.

The government contends that to establish the second element it must be shown that the government *intentionally* caused the delay in order to obtain a tactical advantage over, or to harass, the accused. This would seem to be correct under the cases decided by the Sixth Circuit prior to *Lovasco. See, e. g., United States v. Roberts,* 548 F.2d 665 (6th Cir. 1977); *United States v. Swainson,* 548 F.2d 657 (6th Cir. 1977). This formulation of the rule appears to be derived from this statement in *Marion*:

> [T]he Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial *and* that the delay was an intentional device to gain tactical advantage over the accused.

*United States v. Marion, supra,* 404 U.S. at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 481 (emphasis added). *Lovasco* makes clear, however, that deliberate delay for tactical advantage is not the only cause of pre-indictment delay that may violate due process. The Court refused to predict "in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions," *United States v. Lovasco, supra,* 431 U.S. at 796, 97 S.Ct. at 2052, 52 L.Ed.2d at 763, but it did give its apparent approval to the government's concession that "[a] due process violation might also be made out upon a showing of prosecutorial delay incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense . . . ." *Id.* at 795, n.17, 97 S.Ct. at 2052, 52 L.Ed.2d at 762. These statements strongly indicate that the Supreme Court is willing to find delay unconstitutional when caused by reasons less invidious than deliberate tactical "gamesmanship" by the prosecution.[5] Of course, this court is aware that not "every delay-caused detriment to a defendant's case should abort a criminal prosecution," *id.* at 790, 97 S.Ct. at 2049, 52 L.Ed.2d at 759, but only those that violate "those 'fundamental conceptions of justice which lie at the basis of our civil and political institutions' . . . and which define 'the community's sense of fair play and decency' . . . ." *Id.* In light of these guiding considerations, a careful evaluation of the reasons offered by the government to justify the delay must be undertaken to determine whether the delay was necessary for any legitimate prosecutorial purpose and therefore constitutional.

 Movants, contending that the indictment was obtained by the government

---

**5.** Without expressing its view on their constitutionality, the Court has also cited numerous possible reasons for prosecutorial delay. *See United States v. Lovasco, supra,* 431 U.S. at 797 n.19, 97 S.Ct. at 2052, 52 L.Ed.2d at 763; *Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; *Dickey v. Florida,* 398 U.S. 30, 45 n.9, 51–52, 90 S.Ct. 1564, 1569, 1575–1576, 26 L.Ed.2d 26, 36, 40 (1970) (Brennan, J., concurring). This court believes this provides further support for the proposition that delay caused intentionally to gain tactical advantage over the accused is not the only unconstitutional cause of pre-indictment delay.

for tactical reasons and in bad faith, allege that although the government had originally determined not to charge movants Bradford, Ellingson, LaMasters, Sands, and Smith, it decided to indict them after movant Richburg, a defendant in the first case who remained out of custody until May 1978, refused to plead guilty. At that time, they claim, the government decided that other defendants should be brought into the case in order to make the length and expense of Richburg's trial worthwhile. The affidavits of Richburg's attorney and the assistant United States Attorney reveal that the prosecutor did inform defendant that "if Mr. Richburg desired to go to trial, because the Government estimated that to try him alone would take several weeks, that the Government would probably add additional defendants . . . ." *See* Affidavit of Joe B. Brown, at 3 (filed December 5, 1978). However, the evidence makes abundantly clear that, at least from the end of the first LOC trial, the government intended to have a second LOC indictment including persons whom the government felt had been "missed" in the first case. According to the testimony of the government witnesses, these defendants would have been indicted sometime before the expiration of the statute of limitations even if Richburg had never been found. The ap-

prehension of Richburg determined not whether these defendants would be prosecuted, but merely when. Therefore, the court believes that the circumstances of this indictment do not indicate bad faith or tactical maneuvering by the government. Under the view this court takes of the case, however, this finding does not end the inquiry.

Relying on *Lovasco*, the government seeks to justify the thirty-two month delay by contending that during the period from December 1975 to August 1978 an investigation was being conducted concerning the names and activities of certain defendants and that the files on certain defendants were being reviewed and re-evaluated. It appears from the evidence, however, that the investigation of movants and their alleged crimes ended long before August 1978. By April 1976, when the original LOC defendants were indicted, the government had sufficient evidence to establish the existence of the fraudulent scheme, the same evidence that will likely be used in the present case to prove the fraudulent scheme. The government has stipulated that movants' involvement in the LOC enterprise and the transactions that form the basis of the counts against these movants were known by the government soon after the end of March 1976.[6] *See* Exh. 2, Hear-

6.

| | STIPULATION | |
| --- | --- | --- |
| Count | Defendant | Date of Information |
| 1 | Richburg | FBI 302 (report of interview with witness): 1–26–76; Questionnaire: 2–26–76 |
| 2 | Richburg | FBI 302: 1–27–76 |
| 3 | Richburg | Questionnaire: 2–23–76 |
| 4 | Richburg | FBI 302: 1–29–76 |
| 5 | Richburg | Telephone call: 8–8–78 |
| 12 | Ellingson | FBI 302: 1–27–76 |
| 13 | Ellingson | FBI 302: 2–13–76 |
| 14 | Ellingson | FBI 302: 1–14–76 |
| 15 | Bradford | Questionnaire: 2–17–76 |
| 16 | Bradford | FBI 302: 1–28–76 |
| 17 | Bradford | FBI 302: 2–5–76 |
| 24 | LaMasters | Questionnaire: 2–27–76 |
| 25 | LaMasters | Questionnaire: 2–24–76 |
| 26 | LaMasters | FBI 302: 1–23–76 |
| 27 | Sands | FBI 302: 1–23–76 |
| 28 | Sands | FBI 302: 1–29–76 |
| 29 | Sands | FBI 302: 1–29–76 |
| 30 | Sands | FBI 302: 3–12–76; FBI 302: 3–19–76 |
| 31(3)(i) | Smith | FBI 302: 1–26–76 |
| 31(3)(k) | Smith | Questionnaire: 2–23–76 |
| 31(3)(n) | Smith | Questionnaire: 3–3–76 |

The dates for questionnaires represent the dates on which the questionnaires were sent to the FBI. The dates for FBI 302 reports are the dates when the interviews were conducted. According to FBI agent Roger Myers, the original "case agent" for the LOC investigation, these questionnaires and reports would have been in the hands of the FBI in Nashville within a month or two after the dates indicated in the stipulation.

ing of January 4, 1979. Further evidence of movants' culpability was obtained by the government by interviewing witnesses before, during, and immediately after the first LOC trial in August and September 1976. From that time until the summer of 1978, however, there was no further investigation of movants, no evidence submitted to the grand jury pertaining to them, and no review or re-evaluation of the government's files concerning them. Much like the defendant in *United States v. McLemore, supra,* 447 F.Supp. at 1238, "if not forgotten, [movants were], for all practical purposes, ignored." Placing defendants upon the "back burner" for two years while the government pursued more pressing matters does not, in this court's opinion, constitute an ongoing investigation of those defendants.

The government asserts that during those two years they were actively investigating Southwestern Petroleum Company (hereinafter referred to as SWEPCO), which supplied LOC with the bogus products that movants are charged with promoting, and that under *Lovasco* an investigation of one aspect of a complicated crime is sufficient to justify a delay in seeking indictments against other participants in the offense. The *Lovasco* Court did state that a rule requiring the government to file charges as soon as it can prove beyond a reasonable doubt the guilt of some parties, even though it has not completed its investigation of the entire criminal transaction, could have a deleterious effect upon its ability to prosecute such cases. *United States v. Lovasco, supra,* 431 U.S. at 792–93, 97 S.Ct. at 2050, 52 L.Ed.2d at 761. This is because:

> In some instances, an immediate arrest or indictment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing lawbreakers to justice. In other cases, the prosecutor would be able to obtain

additional indictments despite an early prosecution, but the necessary result would be multiple trials involving a single set of facts. Such trials place needless burdens on defendants, law enforcement officials, and courts.

*Id.*

This court recognizes, of course, that under the law of conspiracy and mail and wire fraud, the charges against movants and SWEPCO may be sufficiently related so that they may be considered parts of a single criminal episode and may be tried in one court proceeding. The court is also aware that prosecutors have a high degree of discretion on these matters. *Id.* at 790, 97 S.Ct. at 2047, 52 L.Ed.2d at 759. It appears, however, that the reasons of preventing an impairment of the government's investigation and avoiding multiple trials do not justify the delay in this case. First, indicting these movants within a reasonable time after September 1976 would not have caused any impairment of the government's investigation of SWEPCO. The government had already indicted some of the participants of this very scheme in April 1976, and that apparently had no adverse effect on the investigation by "causing potentially fruitful sources of information to evaporate before they [were] fully exploited." *Id.* at 792, 97 S.Ct. at 2050, 52 L.Ed.2d at 760. Furthermore, movants were actually indicted six months before SWEPCO was charged. There has been no intimation that this hindered the investigation of SWEPCO, which allegedly continued until the indictment against SWEPCO was returned. Second, stalling the indictment of movants until the completion of the investigation of SWEPCO would not, and has not, avoided a multiplicity of trials on this single criminal transaction. Thirty-two participants in the scheme were convicted in 1976. The court is informed that prosecution of

---

The counts are numbered in the stipulation as they appear in the indictment of August 17, 1978. The same counts, with the exception of count one, are realleged in the superseding indictment of February 2, 1979, although they are numbered differently. Therefore, the dates in the stipulation apply to both indictments.

According to the stipulation, count five is based on information received in August 1978. Since, however, Richburg was charged in the original LOC indictment and this count was added only after he refused to plead guilty to the charges in the first indictment, the court does not consider this date significant.

an unidentified corporation for promoting SWEPCO's products is anticipated. At least with regard to the first LOC trial and the present case, the facts are for the most part identical. Multiple trials have thus already resulted from the government's own actions in prosecuting this case. Finally, the proof establishes that while the government's case against movants was fully developed by September 1976, the investigation of SWEPCO did not commence until the FBI mailed questionnaires to potential witnesses on March 30, 1977, six months later. This fact, considered with the other circumstances mentioned, further undercuts the government's claim that the delay in indicting movants is justified by the ongoing investigation of SWEPCO. The court therefore holds that the delay in this case was not "investigative" within the meaning of *Lovasco*.[7]

The government submits that the delay was justified because the docket of this court was extremely crowded until August 1978, and the expected length of movants' trial would have added unduly to the court's burden. Although this is an accurate description of the docket conditions, the court believes that as a reason for the delay it carries little weight when a defendant's ability to prepare his defense has been actually prejudiced. *See, e. g., Barker v. Wingo, supra,* 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

 Since it does not appear that the delay in indicting movants was either necessary or justified for any reason, the court

believes that to compel movants who have established actual prejudice to their defense to stand trial at this late date would violate fundamental conceptions of justice and fair play and thereby run afoul of the due process clause of the fifth amendment. The court thus will grant the motions to dismiss the indictment as to movants Bradford and LaMasters.

 Movants have also urged the court to exercise its discretionary power to dismiss the indictment for unreasonable delay under Rule 48(b) of the Federal Rules of Criminal Procedure. This contention, however, is totally without merit. *Marion* makes clear that Rule 48(b) is an appropriate remedy only when there has been unnecessary delay between arrest and indictment. *United States v. Marion, supra,* 404 U.S. at 319, 92 S.Ct. at 462, 30 L.Ed.2d at 478. In the present case there was no such delay.

Movant Richburg's case presents the court with another due process question that must be resolved. When Richburg surrendered himself to federal authorities in May 1978, he was the only remaining untried defendant from the first LOC case. His attorney and the assistant United States Attorney discussed the possibility of plea bargaining, and defense counsel was informed that if Richburg desired to go to trial, the government would indict other persons to be tried along with him. *See* Affidavit of Joe B. Brown, at 3 (filed December 5, 1978); Affidavit of James W. Price, Jr. (filed September 11, 1978). Rich-

---

**7.** The court does not believe that, in finding that the delay in the present case was not "investigative," it is establishing a constitutional requirement for prosecutors to seek an indictment as soon as they believe they have sufficient evidence to prove guilt beyond a reasonable doubt. *Lovasco* noted reasons for not imposing such a requirement: the difficulty in pin-pointing exactly when such a degree of evidence has been obtained would pressure prosecutors into resolving doubtful cases in favor of prosecution, thereby increasing the risk of the bringing of unwarranted charges; and the decision whether or not to prosecute would often have to be made before the government has had an opportunity to give full consideration to the desirability of not prosecuting a

particular suspect. Certainly this court would not want in any way to cause such circumstances to arise. In this case, however, the government had decided by the autumn of 1976 to prosecute these movants and thus, implicitly, had determined that it had assembled sufficient evidence to prove guilt beyond a reasonable doubt and that to prosecute movants would be more desirable than not to prosecute them. Thus, the court merely holds that in these circumstances, in which the government had completed its investigation of movants and had definitely decided to prosecute them two years before the indictment was sought, the delay is not justified by the considerations outlined in *Lovasco*.

burg did not accept the government's offer, and the government sought and obtained the superseding indictment in which the other movants were named as defendants. Moreover, Richburg, who had been named in only four counts in the original indictment, was charged in six counts in the superseding indictment. Richburg claims that these charges were added to increase the possible maximum sentence that may be imposed upon him and thus to punish him for insisting on his right to be tried by a jury.

In *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604, *rehearing denied*, 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978), the United States Supreme Court held that the due process clause was not violated when a prosecutor carried out a threat made during plea negotiations to reindict the accused on more serious charges if he did not plead guilty to the offense with which he was originally charged. The Court stated:

> To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, . . . and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is "patently unconstitutional." . . . But in the "give-and-take" of plea bargaining, there is no such element of punishment or retaliation *so long as the accused is free to accept or reject the prosecution's offer.*

*Id.* at 363, 98 S.Ct. at 668, 54 L.Ed.2d at 610–11 (emphasis added). The Court distinguished, however, the situation in which "the prosecutor without notice brought an additional and more serious charge after plea negotiations relating only to the original indictment had ended with the defendant's insistence on pleading not guilty." *Id.* at 360, 98 S.Ct. at 666, 54 L.Ed.2d at 609. In the latter case, because the defendant is not fully informed during negotiations that he risks having extra charges brought against him, the free bargaining element that would prevent the risk from being fundamentally unfair is not present.

In the present case, movant was not informed during the plea negotiations that the assistant United States Attorney would seek additional charges against him if he did not plead guilty to the original indictment. Movant was not free to accept or reject this as a term of the prosecution's offer. Therefore the government's action of charging movant in two extra counts in the superseding indictment is not saved from unconstitutionality because of the *Bordenkircher* holding.

The government contends that there were valid reasons for bringing additional charges against movant, particularly because at the time of the original indictment the government did not know that movant had sold more than one product and thus did not realize the full extent of movant's culpability. These matters were not learned until the prosecutor reviewed his file on Richburg in preparing for trial in the summer of 1978. *See* Affidavit of Joe B. Brown, at 2–3 (filed December 5, 1978). Furthermore, the assistant United States Attorney involved in the plea negotiations testified that in obtaining extra charges against movant, he had no motive of retaliation against, nor intent to punish, movant for his refusal to plead guilty.

Although these assertions are probably true, they are not relevant in determining whether or not the government's action here was unconstitutional. The test is whether or not movant would have been charged with the additional counts had he not exercised his right to plead not guilty. *See United States v. McFadyen-Snider*, 590 F.2d 654 (6th Cir. 1979). The evidence shows that the government contained in its files enough information to charge other more culpable defendants in the original LOC case with additional crimes; that the government was aware of this fact; and that no additional charges were filed against these other defendants. From this it appears likely that Richburg would not have been charged with additional counts had he pleaded guilty to the original indictment. Considering this likelihood along with the timing of the additional charges,

the court finds that the bringing of extra counts in the superseding indictment had the effect of punishing movant for exercising his constitutional right to demand a jury trial. Because the government's action, therefore, violated the due process clause, *United States v. McFadyen-Snider, supra,* the court will dismiss the two additional counts against movant Richburg.[8]

One further issue remains. One original indictment and two superseding indictments have been obtained in this case.[9] Movant Richburg was named a defendant in all three, and the other movants were charged in the latter two. At the hearings, held before the latest superseding indictment was filed, movant Richburg expressed concern that the first indictment was still "alive" and would in some way expose him to an increased risk of criminal penalty. At this juncture, the court is not sure how that would be so. Although refusing to agree to dismiss the original indictment, the government did state that Richburg would be tried only upon the superseding indictment. The court assumes that the government will now try movants only upon the latest superseding indictment. Since that is the case, the court believes that this issue, which the parties have not briefed, is not ripe for adjudication.

---

**8.** In light of the court's disposition of movant Richburg's claim on this ground, the court will not address the question of the constitutionality of the prosecutor's threat, during plea negotiations, to indict other persons should movant choose to insist on a trial. *See Bordenkircher*

*v. Hayes, supra,* 434 U.S. at 364, 98 S.Ct. at 668, 54 L.Ed.2d at 611.

**9.** The original indictment, returned on April 12, 1976, was superseded by an indictment obtained on August 17, 1978, which, in turn, was superseded on February 2, 1979.